## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KOOKMIN BANK CO., LTD., in its capacity as Trustee of KTB CRE DEBT FUND NO. 8, a Korean Investment Trust, by its agent in Korea DAOL FUND MANAGEMENT CO. and by its Agent in the United States, REXMARK HOLDINGS LLC d/b/a REXMARK,<br><br>Plaintiff,<br><br>v.<br><br>BEN ASHKENAZY,<br><br>Defendant. | Case No. 1:22-cv-05802-GHW<br><br><br><br>**ANSWER** |

Defendant Ben Ashkenazy ("Ashkenazy") answers the Amended Complaint of Plaintiff

Kookmin Bank Co., Ltd ("Kookmin") as follows:

### NATURE OF CASE[1]

1.      This case arises from two loans made in connection with the ground lease of Washington Union Station ("Union Station")—a mortgage loan and a mezzanine loan.  These loans, which have been in default since May 2020, now collectively exceed $560 million in due and unpaid debt.  To induce the lender to make these loans, Ashkenazy executed guaranties of certain recourse obligations of each of the borrowers under the loans.  Certain conduct by the borrowers, their affiliates, or Ashkenazy triggers springing recourse, which requires Ashkenazy to pay the entire debt.  Other conduct by the borrowers, their affiliates, or Ashkenazy triggers the borrower's recourse liabilities, which requires the borrowers and Ashkenazy to pay actual loss or damage incurred by Lender arising out of the proscribed conduct.  Under the guaranties, Ashkenazy is personally liable for all recourse obligations of the borrower.

ANSWER:  Ashkenazy denies the allegations of Paragraph 1 except admits that: Kookmin is the

lender in connection with the mortgage loan and mezzanine loan (the "Loans"); the Loans were

---

[1]      Ashkenazy does not deem the section headings in the Amended Complaint to constitute allegations of the Amended Complaint.  To the extent any section headings are allegations, Ashkenazy admits or denies them consistent with his responses to the allegations contained in the numbered paragraphs of the Amended Complaint.

in default beginning May 2020; the terms of the Loans are reflected in Loan Agreements;

Ashkenazy executed limited guaranties (the "Guaranties") of the Loans whose terms are

reflected in the Loans and the Guaranties.

2.      Ashkenazy's continued interference with Lender's rights under the loan
documents and his active involvement in thwarting Lender's rights through false representations
to the court and third parties, among other misconduct, have triggered both the springing
recourse and recourse liabilities provisions in the guaranties. Ashkenazy owes Lender the full
amount due under the two loans—an amount exceeding $560 million as of the date of this
filing—and actual damages sustained by Lender as a result of Ashkenazy's misconduct.

ANSWER:  Paragraph 2 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 2.

## PARTIES

3.      Kookmin is a South Korean bank serving as the Trustee of KTB CRE Debt Fund
No. 8 (i.e. the Trust), a South Korean investment trust.  The Trust's agent in South Korea is Daol
Fund. The Trust's agent in United States is Rexmark, which oversees the day-to-day
management of the loans. Rexmark is a limited liability company organized and existing under
the laws of New York, located at 295 Madison Avenue, Suite 1200, New York, New York
10017.  Rexmark, the Trustee, Trust, and Daol Fund are referred to collectively as Lender.
Lender is the holder of two loans made in 2018—a mortgage loan and a mezzanine loan—over
the leasehold interest in Union Station.

ANSWER:  Ashkenazy admits that Rexmark Holdings LLC ("Rexmark") purports to act as

agent for Kookmin in connection with the Loans.  Ashkenazy lacks knowledge or information

sufficient to form a belief as to the truth of the other allegations in Paragraph 3 and therefore

denies those allegations, except admits that Kookmin was the holder of the Loans made in 2018.

4.      Upon information and belief, Ashkenazy is an individual residing in New York,
New York.  Ashkenazy is the guarantor of both the mortgage and mezzanine loans over the
leasehold interest in Union Station.

ANSWER:  Ashkenazy admits that he resides in New York.  Ashkenazy admits he signed two

documents each called a "Guaranty of Recourse Obligations," the contents of which speak for

themselves.  Ashkenazy denies the remaining allegations in Paragraph 4 and refers to the content

of the Guaranties for their contents.

5.     Non-party Union Station Investco, LLC ("USI" or "Mortgage Borrower"), a Delaware limited liability company, holds the leasehold interest in Union Station.  Ashkenazy was USI's manager until replaced in May 2022.

ANSWER: Ashkenazy denies the allegations in Paragraph 5, except admits that Union Station

Investco ("USI") is a limited liability company organized under the laws of the State of

Delaware.  Ashkenazy further states that upon the filing of the action captioned *Nat'l R.R.*

*Passenger Corp. (Amtrak) v. Sublease Interest Pertaining to Described Leasehold Interests at*

*Washington Union Station, et al.*, 1:22-cv-01043-APM in the United States District Court for the

District of Columbia on April 14, 2022 (the "Condemnation Action"), title to the leasehold

interest in Union Station was transferred to Amtrak.

6.     Non-party Union Station Sole Member, LLC ("USSM" or "Mezz Borrower"), a Delaware limited liability company, previously held 100% of the ownership interests in USI.  As further explained below, on June 14, 2022, after USSM defaulted under the mezzanine loan, Lender foreclosed on USSM's membership interests in USI through a properly noticed Uniform Commercial Code ("UCC") foreclosure sale.  In a related case pending before this Court, USSM challenges the validity of the foreclosure sale.  *See Daol Rexmark Union Station LLC et al. v. Union Station Sole Member, LLC*, 1:22-cv-06649-GHW (S.D.N.Y.).  Both USI and USSM are affiliated with the Ashkenazy Acquisition Corporation ("AAC"), a sophisticated real-estate investment firm in which Ashkenazy serves as the CEO and Chairman.

ANSWER: Paragraph 6 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 6, except admits that USI and Union Station Sole Member LLC ("USSM") are

affiliated with Ashkenazy Acquisition Corporation ("AAC") and Ashkenazy serves as the CEO

and Chairman of AAC.

7.     Non-party National Railroad Passenger Corporation ("Amtrak") filed a declaration of taking on the leasehold interest in Union Station held by USI on April 14, 2022. This purported taking is being separately challenged in a case brought before the United States District Court for the District of Columbia. *See National Railroad Passenger Corp. ("Amtrak") v. Sublease Interest Pertaining to Described Leasehold Interests at Washington Union Station, et al.*, 1:22-cv-01043-APM (D.D.C.).

ANSWER:  Ashkenazy admits that the Condemnation Action was filed on April 14, 2022 and is

currently pending.  Ashkenazy denies the remainder of the allegations in Paragraph 7 and refers

to the documents filed in the Condemnation Action for their contents.

## JURISDICTION AND VENUE

8.      Jurisdiction and venue are proper before this Court under New York Civil
Practice Law and Rules 301 and 501 because Ashkenazy is a resident of New York and the
contractual provisions fix venue in New York County.

ANSWER:  Ashkenazy admits that jurisdiction and venue are proper in this District.

## STATEMENT OF FACTS

9.      Lender holds two loans made in 2018 for the leasehold interest in Union
Station— a mortgage loan and a mezzanine loan.

ANSWER: Ashkenazy lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 9 and therefore denies the allegations in Paragraph 9, except

admits that Kookmin was at one point the holder of the Loans.

10.     The mortgage loan is a $330 million loan made to Mortgage Borrower, i.e. USI,
by Citi Real Estate Funding, Inc. and Natixis Real Estate Capital LLC (together, the "Original
Mortgage Lender"), which was secured by USI's leasehold interest in Union Station (the
"Mortgage Loan"). The Mortgage Loan is evidenced by, among other documents, that certain
Mortgage Loan Agreement between USI and the Original Mortgage Lender, dated as of May 8,
2018 (as amended, modified, restated, and/or replaced from time to time, the "Mortgage Loan
Agreement").

ANSWER:  Ashkenazy admits that the terms of the Mortgage Loan are memorialized in, among

other documents, the Mortgage Loan Agreement, between USI and the Original Mortgage

Lender, dated as of May 8, 2018.  Ashkenazy denies the remaining allegations in Paragraph 10

and refers to the Mortgage Loan Agreement for its contents.

11.     The mezzanine loan is a loan made in the principal amount of $100 million by
Lender to Mezz Borrower, i.e. USSM, directly (the "Mezz Loan"), which was secured by
USSM's 100% ownership interest in USI.  The terms of USSM's pledge of its ownership interest
in USI to Lender are set forth in that certain Mezzanine Loan Agreement, dated May 8, 2018 (the
"Mezz Loan Agreement") and a Pledge and Security Agreement, dated May 8, 2018 (the "Pledge
Agreement," and together with the Mezz Loan Agreement, the Mortgage Loan Agreement, and

all other documents executed in connection with the Mezz Loan and the Mortgage Loan, the "Loan Documents").

ANSWER:  Ashkenazy admits that the terms of the Mezz Loan are memorialized in, among

other documents, the Mezzanine Loan Agreement, between USSM and the Kookmin, dated as of

May 8, 2018.  Ashkenazy denies the remaining allegations in Paragraph 11 and refers to the

Mezzanine Loan Agreement for its contents.

12.    Failure to pay monthly debt service when due constitutes an "Event of Default" under the Mortgage and Mezz Loan Agreements.  (*See* Mortgage Loan Agreement at § 10.1(a); Mezz Loan Agreement at § 10.1(a)).

ANSWER: Paragraph 12 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 12 and refers to the documents referenced therein for their contents.

13.    In or around May 2020, USI defaulted under the Mortgage Loan, and USSM defaulted under the Mezz Loan.

ANSWER: Ashkenazy admits the allegations in Paragraph 13.

14.    USSM and Lender agreed to a forbearance period in which Lender did not take action against USSM and thereafter Lender extended millions of dollars in protective advances to provide USSM an opportunity to bring the Mezz Loan back into good standing.

ANSWER: Ashkenazy denies the allegations in Paragraph 14 except admits that the parties

agreed in 2020 to a forbearance period in connection with the Loans.

15.    Nevertheless, USSM failed to make additional payments on the Mezz Loan.

ANSWER: Ashkenazy denies the allegation in Paragraph 15.

16.    On November 12, 2021, in response to USSM's continued default under the Mezz Loan, Lender accelerated the Mezz Loan.

ANSWER: Ashkenazy denies the allegation in Paragraph 16 except admits that the Kookmin

purported to accelerate the Mezz Loan in November 2021.

17.    USI was also in continuing default on the Mortgage Loan, and on November 19, 2021, the Original Mortgage Lender noticed a foreclosure sale under the Mortgage Loan.

ANSWER:  Ashkenazy admits that on November 19, 2021, USI, through AAC, received a letter

from Green Loan Services LLC, as Special Servicer of US 2018-USDC, Commercial Mortgage

Pass-Through Certificates Series 2018-USDC, purporting to provide "notice" of "a publicly

advertised foreclosure sale" with respect to the Mortgage Loan.  Ashkenazy denies the remaining

allegations in Paragraph 17 and refers to the referenced document for its contents.

18.     On November 22, 2021, Lender noticed a UCC foreclosure sale of the Mezz Loan
to be held on January 4, 2022.

ANSWER:  Ashkenazy admits that on November 22, 2021, USSM received a letter from

Kookmin purporting to be a "notice of disposition of collateral via public foreclosure sale" with

respect to the Mezzanine Loan.  Ashkenazy denies the remaining allegations in Paragraph 18 and

refers to the referenced document for its contents.

19.     In January 2022, Lender purchased the Mortgage Loan for approximately $358
million and assumed the rights and obligations of the Original Mortgage Lender under the
Mortgage Loan Agreement.

ANSWER:  Ashkenazy lacks the knowledge or information sufficient to form a belief regarding

the allegations of Paragraph 19 and therefore denies the allegations of Paragraph 19.

20.     After purchasing the Mortgage Loan, Lender cancelled both of the pending
foreclosure sales, even though USI and USSM continued to be in default.

ANSWER:  Ashkenazy admits that the foreclosure sales about which USI and USSM received

notice, as referenced in Ashkenazy's Answer to Paragraph 17 and 18, did not occur.  Ashkenazy

denies the remaining allegation in Paragraph 20.

21.     Based on USSM's continuing default, Lender planned to re-notice the foreclosure
on the Mezz Loan and begin marketing the interest.

ANSWER:  Ashkenazy lacks the knowledge or information sufficient to form a belief regarding

the allegations of Paragraph 21 and therefore denies the allegations of Paragraph 21.

22.     Upon information and belief, Ashkenazy told Amtrak about Lender's plans to
foreclose on the Mezz Loan in order to frustrate and delay the foreclosure and induce Amtrak to

act in a way that would help Ashkenazy avoid the consequences of the continuing defaults under the Loan Documents.  As Ashkenazy hoped, Amtrak filed its declaration of taking and has sided with Ashkenazy in his plans to frustrate Lender's rights.

ANSWER: Ashkenazy denies the allegation in Paragraph 22.

23.     On April 14, 2022, Amtrak filed its declaration of taking in the United States District Court for the District of Columbia.  Lender, USI, and USSM are all challenging Amtrak's authority to take the leasehold interest in Union Station by eminent domain.

ANSWER: Ashkenazy admits that the Condemnation Action was filed on April 14, 2022.

Ashkenazy denies the remaining allegation in Paragraph 23 and refers to the documents filed in

the Condemnation Action for their contents.

24.     Pursuant to the statute governing Amtrak's limited eminent-domain authority, Amtrak holds the titular interest in the leasehold.

ANSWER: Paragraph 24 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy admits that upon the filing

of the Condemnation Action, title to the leasehold interest for Union Station transferred to

Amtrak, and Ashkenazy denies the remaining allegations in Paragraph 24.

25.     USI remains in current possession of the leasehold interest in Union Station and continues to manage the property as it has in the past. USI also has the authority to challenge Amtrak's purported taking and the right to any just compensation award as the holder of the leasehold interest.

ANSWER: Paragraph 25 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 25.

26.     On May 13, 2022, Lender noticed a second UCC foreclosure sale of the Mezz Loan to be held on June 14, 2022.

ANSWER:  Ashkenazy admits that on May 13, 2022, USSM, through AAC, received a

document captioned "Notice Of Disposition Of Collateral Via A Public Foreclosure Sale Under

Article 9 Of The Uniform Commercial Code And Reservation Of Rights" and refers to the

document for its contents.

27.     The UCC foreclosure sale proceeded at public auction after being marketed by Cushman & Wakefield.  Over 100 confidentiality agreements were approved leading up to the sale. At the foreclosure sale, Lender was the highest bidder, purchasing USSM's membership interests in USI for $140,535,334.53 by credit bid.

ANSWER:  Ashkenazy lacks the knowledge or information sufficient to form a belief regarding

the allegations of Paragraph 27 and therefore denies the allegations of Paragraph 27.

28.     Neither Ashkenazy nor USSM challenged or objected to the foreclosure sale for the Mezz Loan before it occurred.  Ashkenazy and USSM did not declare bankruptcy or seek relief from any court.

ANSWER: Ashkenazy denies the allegation in Paragraph 28 except admits that neither

Ashkenazy nor USSM has declared bankruptcy.

29.     However, Ashkenazy and his affiliates acted as if the foreclosure sale never occurred.  To third parties and in court filings, Ashkenazy and his affiliates continued to misrepresent that Ashkenazy retained control and authority over USI.

ANSWER: Ashkenazy denies the allegation in Paragraph 29.

30.     Seeking a judgment regarding the ownership and control of USI, Lender brought a declaratory judgment action in a related action before this Court (the "Declaratory Judgment Action"). *See Daol Rexmark Union Station LLC et al. v. Union Station Sole Member, LLC*, 1:22-cv-06649-GHW (S.D.N.Y.).

ANSWER:  Ashkenazy admits that the referenced litigation (the "DJ Action") was filed on

August 4, 2022.  Ashkenazy denies the remaining allegations in Paragraph 30 and refers to the

documents filed in the DJ Action for their contents.

31.     In the Declaratory Judgment Action, USSM challenged the validity of the foreclosure sale and refused to acknowledge that the foreclosure sale extinguished all of USSM's right, title, and interest in and to USI. *See id.* at ECF Doc. No. 45.

ANSWER: Paragraph 31 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 31 and refers to the documents filed in the DJ Action for their contents.

32.     On August 25, 2022, after holding a hearing and ruling from the bench in Lender's favor, the Court issued a preliminary injunction order in the Declaratory Judgment Action. *See id.* at ECF Doc. No. 39 (the "PI Order"); *see also id.* at ECF Doc. No. 49 (the "PI Transcript").

ANSWER:  Ashkenazy admits that on August 25, 2022, the Court entered a preliminary

injunction (the "PI Order") in the DJ Action upon an application from Kookmin and affiliates.

Ashkenazy denies the remaining allegations in Paragraph 32 and refers to the PI Order for its

contents.

33.     The PI Order enjoins "USSM, its officers, directors, members, employees, agents, and all those acting in concert with any of them (the 'Restrained Parties'), during the pendency of th[at] action, from (1) holding itself out as the owner or in control of [USI]; (2) exercising or purporting to exercise any contractual or other legal right of USI; (3) collecting, transferring, seizing, or directing the transfer of any assets or liabilities of USI; and (4) impeding the collection or transfer of any assets to USI that are owed to it." *Id.*

ANSWER:  Ashkenazy admits that the text quoted in Paragraph 33 is an accurate partial

quotation, with additions/changes in brackets, of the PI Order.

34.     On September 28, 2022, counsel for Lender requested that USSM consent to judgement in the Declaratory Judgment Action but USSM did not acknowledge Lender's request.

ANSWER:  Ashkenazy denies the allegations in Paragraph 34.

35.     Accordingly, there remains a justiciable controversy as to the validity and effect of the foreclosure sale until this Court resolves the pending claim in the Declaratory Judgment Action.

ANSWER:  Ashkenazy admits the allegation in Paragraph 35.

36.     Lender's position is that USSM no longer has any rights or interest in Union Station and that Lender owns all of the membership interests in USI, giving Lender the operational control in the management of Union Station.

ANSWER: Paragraph 36 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 36.

37.     In sum, Lender has directly loaned USSM $100 million and purchased the Mortgage Loan for $358 million. In addition, Lender has made millions of dollars in protective advances. These outlays are in addition to the costs of enforcement, regular and default interest, and fees that have accrued under the two loans.  Lender is owed more than $420 million in connection with the Mortgage Loan alone.  The current debt owed to Lender is more than $560 million.

ANSWER: Paragraph 37 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 37.

38.     In connection with both the Mortgage Loan and the Mezz Loan, Ashkenazy unconditionally guaranteed payment and performance of certain guaranteed obligations, including the recourse obligations of the borrower.  The provisions of the Guaranty of Recourse Obligations, dated as of May 8, 2018, between Ashkenazy and Original Mortgage Lender (the "Mortgage Guaranty") and the provisions of the Guaranty of Recourse Obligations (Mezzanine Loan), dated as of May 8, 2018, between Ashkenazy and Lender (the "Mezz Guaranty") are substantially similar.

ANSWER: Paragraph 38 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 38 and refers to the documents referenced therein for their contents.

39.     Neither the Mortgage Loan nor the Mezz Loan is a recourse loan unless a recourse trigger event occurs.  If a recourse event does occur, Lender can seek a money judgment against Borrower and Ashkenazy.  Section 11.22 of the Mortgage and Mezz Loan Agreements describes the two types of recourse trigger events:  the Springing Recourse Event and the Borrower's Recourse Liabilities.

ANSWER:  Ashkenazy denies the allegations in Paragraph 39 and refers to the documents

referenced therein for their contents.

40.     Upon the occurrence of a Springing Recourse Event, the Mortgage Loan and Mezz Loan become fully recourse, and Lender may seek a money judgment against Borrower and/or Ashkenazy for the full amount due under the Mortgage Loan and the Mezz Loan.

ANSWER:  Ashkenazy denies the allegations in Paragraph 40 and refers to the documents

referenced therein for their contents.

41.     Specifically, "the Debt shall be fully recourse to Borrower in the event that . . . any Affiliate, officer, director, or representative which Controls Borrower consents to or

acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property other than in connection with a request or action commenced by Lender or its affiliate." (Mortgage Loan Agreement at § 11.22; *see also* Mezz Loan Agreement at § 11.22, referred to collectively as the "Custodian Provision").

ANSWER:  Ashkenazy denies the allegations in Paragraph 41 and refers to the documents

referenced therein for their contents.

42.    In addition to a Springing Recourse Event, upon the occurrence of the Borrower's Recourse Liabilities, Lender may seek a money judgment against Borrower and/or Guarantor for "actual loss, damage, cost, [or] expense . . . incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with" the recourse event, including:

(a)    ". . . intentional material misrepresentation in writing by Borrower, Guarantor or any Affiliate . . . in connection with the Loan" (Mortgage Loan Agreement at § 11.22(i); *see also* Mezz Loan Agreement at § 11.22(i), referred to collectively as the "Misrepresentation Provision"); and

(b)    "the gross negligence or willful misconduct by, or at the direction of, Borrower, Guarantor or any Affiliate . . . in connection with the Loan" (*id.* at § 11.22(ii), referred to collectively as the "Misconduct Provision").

ANSWER:  Ashkenazy denies the allegations in Paragraph 42 and refers to the documents

referenced therein for their contents.

43.    The Recourse Liabilities are not tied to the amount of the underlying loan, but consist of any losses, damages, costs, or expenses sustained by Lender.

ANSWER:   Paragraph 43 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 43 and refers to the documents referenced therein for their contents.

44.    Under both the Mortgage and Mezz Guaranties, Ashkenazy "hereby irrevocably and unconditionally covenants and agrees that it is liable, subject to the terms hereof, for the Guaranteed Obligations as a primary obligor." (Mortgage Guaranty at § 1.1; Mezz Guaranty at § 1.1). "Guaranteed Obligations" is further defined as "Borrower's Recourse Liabilities and [] from and after the date that any Springing Recourse Event occurs, payment of the entire Debt." (*Id.* at § 1.1(a)).

ANSWER:  Ashkenazy denies the allegations in Paragraph 44 and refers to the documents

referenced therein for their contents.

45.     Under each Guaranty, Ashkenazy is personally liable if the springing recourse or recourse liabilities are triggered by actions taken by the Mortgage Borrower, Mezz Borrower, Ashkenazy himself, or any of their affiliates.

ANSWER: Paragraph 45 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 45.

46.     By hiding behind a veil of purported "status quo," Ashkenazy has wrongfully arrogated to himself the control and management rights of Union Station that rightfully belong to Lender.  After Borrower's default, Lender properly exercised various rights and remedies provided under the Loan Documents to protect its interest in the collateral, including conducting a foreclosure sale on USSM's equity interests in USI.  Ashkenazy, therefore, has no remaining interest in Union Station.

ANSWER:  Paragraph 46 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 46.

47.     Yet, Ashkenazy remained in the operating seat until the Court entered the PI Order in the Declaratory Judgment Action, directing the property's management through its agent, Jones Lang LaSalle Americas, Inc. "(JLL")", that served as the property manager for Union Station.  Ashkenazy's improper control of Lender's possessory rights over Union Station triggered the Custodian Provision under both the Mortgage and Mezz Loan Agreements, creating a Springing Recourse Event and personal liability for Ashkenazy as the Guarantor.

ANSWER:  Paragraph 47 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 47.

48.     JLL served as the property manager pursuant to a Master Management Agreement with AAC. The agreement was entered into when Ashkenazy remained the manager of USI.

ANSWER:  Ashkenazy denies the allegations in Paragraph 48 except admits that AAC and Jones

Lang LaSalle Americas Inc. are parties to a Master Management Agreement.

49.     Pursuant to Lender's rights and remedies under the Loan Documents, on April 28, 2022, Lender terminated JLL.

ANSWER:  Paragraph 49 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 49.

50.     On May 13, 2022, Lender exercised its rights under the Pledge Agreement to replace Ashkenazy as manager of USI. William Henrich was appointed as the new independent manager of USI.

ANSWER:  Ashkenazy admits that on May 13, 2022 USI, USSM, and AAC received a letter

from counsel to Kookmin purporting to exercise rights under Section 9(a) of the Pledge

Agreement.  Ashkenazy denies the remaining allegations in Paragraph 50 and refers to the

referenced letter for its contents.

51.     USI, under Henrich's direction, intended to engage a new property management firm to ensure that the property manager took direction from USI, not from Ashkenazy or AAC. Henrich worked with JLL and Cushman & Wakefield ("Cushman") to ensure a seamless transition—until Ashkenazy interfered.

ANSWER:  Ashkenazy lacks the knowledge or information sufficient to form a belief regarding

the allegations of Paragraph 51 and therefore denies the allegations of Paragraph 51.

52.     Upon learning of USI's plan to replace JLL, Ashkenazy coordinated with Amtrak and JLL to block, hinder, and frustrate Lender's exercise of its rights and remedies. Ashkenazy's conduct was based on his prior position as manager for USI, the Mortgage Borrower, that he refused to relinquish and his ownership interests in USI through USSM, the Mezz Borrower.

ANSWER: Paragraph 52 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 52.

53.     Amtrak moved for an order to enjoin any defendant in the eminent-domain proceeding from terminating JLL as the property manager of Union Station during the pendency of the proceeding.

ANSWER:  Ashkenazy admits the allegation in Paragraph 53.

54.     USI, under Henrich's direction, had already retained counsel to defend its position in the eminent-domain proceeding.

ANSWER:  Ashkenazy lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 54 and therefore denies the allegations in Paragraph 54.


55.     However, Ashkenazy retained separate counsel and falsely represented that
ArentFox Schiff LLP ("ArentFox") and Kasowitz Benson Torres LLP ("Kasowitz") represented
both USSM and USI.  Ashkenazy hired ArentFox and Kasowitz in contravention of Lender's
exercise of rights to replace Ashkenazy as manager of USI.

ANSWER:  Ashkenazy admits that AAC, on behalf of USI and USSM, retained ArentFox Schiff

LLP ("ArentFox") and Kasowitz Benson Torres LLP ("Kasowitz") as counsel for USI and

USSM in the Condemnation Action.  Ashkenazy denies the remaining allegations in Paragraph

55


56.     A Springing Recourse Event occurred on or about May 20, 2022, when ArentFox
and Kasowitz informed Amtrak's counsel that both USI and USSM "consent to preserve the
status quo of Union Station management" as a response to Amtrak's motion to enjoin the
termination of JLL.

ANSWER: Paragraph 56 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 56.


57.     This communication at the direction of Ashkenazy's counsel triggered the
Custodian Provision, which makes the Debt fully recourse if a representative of the Borrower
"consents to or acquiesces in or joins in an application for the appointment of a custodian . . .
other than in connection with a request or action commenced by Lender or its affiliate."

ANSWER: Paragraph 57 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 57.


58.     Ashkenazy's counsel made the statement to Amtrak as a representative of both the
Mortgage Borrower (USI) and Mezz Borrower (USSM).

ANSWER:  Ashkenazy denies the allegations in paragraph 58 and refers to the referenced

document for its content.

59.     Based on the context of the Loan Documents, JLL is a custodian who had charge of the building under USI's direction.

ANSWER: Paragraph 59 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 59.


60.     Because Lender had already terminated JLL at this point, the consent to Amtrak's request that JLL remain as property manager constitutes consent or acquiescence in the appointment of an alternate custodian to manage the property, triggering a Springing Recourse Event under both the Mortgage and Mezz Guaranties.

ANSWER:  Paragraph 60 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 60.

61.     Lender subsequently rescinded its notice to terminate JLL, and USI (through Henrich) joined with Lender in agreeing not to take action to replace or terminate JLL without further order from the Court.

ANSWER:  Ashkenazy lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 61 and therefore denies the allegations in Paragraph 61.

62.     However, Ashkenazy continued to interfere with Lender's ability to control and manage Union Station.  On June 24, 2022, Lender filed an Emergency Motion for Approval of Contract with Property Manager in the eminent-domain proceeding ("Emergency Motion").

ANSWER:  Paragraph 62 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 62 except admits that Kookmin filed a motion captioned "Emergency Motion for

Approval of Contract with Property Manager" in the Condemnation Action on June 24, 2022.

63.     Lender's Emergency Motion was necessary because Ashkenazy's counsel repeatedly demanded that Lender continue to fund Union Station's operations ***through*** Ashkenazy as if Lender never foreclosed on the Mezz Loan and purchased the collateral by credit bid.  Although still in dispute in the Declaratory Judgment Action, Lender's position is that Ashkenazy no longer has any role in Union Station because he no longer serves as USI's manager and USSM no longer owns any membership interest in USI.

ANSWER:  Paragraph 63 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 63.

64.     Lender's Emergency Motion asked the court to direct JLL to enter into a
property-management agreement with USI or Lender directly—rather than continue to rely on a
Master Management Agreement with AAC who was no longer involved in the property—or
allow Lender to contract with a separate property management firm, i.e. Cushman.

ANSWER:  Paragraph 64 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 64 and refers to the referenced document for its contents.

65.     Lender reached out to JLL directly to ask for a JLL-controlled account in which
Lender could send the requested funds to pay the obligations due and payable related to Union
Station's management and operation. JLL never responded to this request.

ANSWER:  Ashkenazy lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 65 and therefore denies the allegations in Paragraph 65.

66.     Upon information and belief, Ashkenazy directed JLL to not work with Lender to
secure funding for Union Station unless Lender agreed to fund through AAC.  Ashkenazy acted
as a purported representative for both the Mortgage Borrower (USI) and Mezz Borrower
(USSM).

ANSWER:  Ashkenazy denies the allegations in Paragraph 66.

67.     In response to Lender's Emergency Motion, on June 26, 2022, Ashkenazy's
counsel filed a letter (later rejected by the court), representing that JLL continued to manage
Union Station "pursuant to an existing management contract" and that the status quo has been
retained ("June 26 Letter").

ANSWER:   Ashkenazy admits that ArentFox and Kasowitz filed a letter in response to the

motion described in Paragraph 62.  Ashkenazy denies the remaining allegations in Paragraph 67

and refers to the letter for its contents.

68.     The June 26 Letter further evidences Ashkenazy's challenge to Lender's right to
appoint a custodian to manage thereby "consent[ing] to or acquiesce[ing] in" a reappointment of
JLL as the property manager against Lender's rightful exercise of rights under the Loan
Documents.

ANSWER: Paragraph 68 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 68 and refers to the referenced letter for its contents.

69.     Ashkenazy's counsel filed the letter purportedly on behalf of both USI and USSM.

ANSWER:  Ashkenazy denies the allegations of Paragraph 69 except admits that the letter referenced in Paragraph 67 was filed on behalf of USI and USSM.

70.     Lender subsequently moved to have the court in the eminent-domain proceeding schedule a hearing on its Emergency Motion.

ANSWER:  Ashkenazy admits the allegations in Paragraph 70.

71.     On June 30, 2022, Ashkenazy's counsel reiterated the position taken in the June 26 Letter, filing a Limited Opposition to Lender's Request to Schedule Hearing ("Limited Opposition").

ANSWER:  Ashkenazy admits that on June 30, 2022, ArentFox and Kasowitz filed an opposition to the motion referenced in Paragraph 70.  Ashkenazy denies the remaining allegations in Paragraph 71 and refers to the referenced document for its content.

72.     Ashkenazy's counsel filed the Limited Opposition purportedly on behalf of both USI and USSM.

ANSWER:  Ashkenazy denies the allegations in Paragraph 72 except admits that the opposition reference in Paragraph 72 was filed on behalf of USI and USSM.

73.     Ashkenazy's consent to Amtrak's request, the June 26 Letter, and the Limited Opposition constitute an attempted takeover by Ashkenazy of Lender's management rights over Union Station made under the pretext of maintaining the "status quo."

ANSWER: Paragraph 73 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 73.

74.     Ashkenazy directed counsel retained for USSM and purportedly for USI to consent to Amtrak's request, file the June 26 Letter, and file the Limited Opposition. Ashkenazy's counsel claimed to represent both the Mortgage Borrower (USI) and Mezz Borrower (USSM) when consenting and acquiescing to the appointment of a custodian. Ashkenazy's misconduct triggered a Springing Recourse Event under the Custodian Provision in both the Mortgage and Mezz Loan Agreements, creating personal liability for Ashkenazy for the entire debt owed on the loans.

ANSWER: Paragraph 74 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 74.

75.     The Recourse Liabilities were tripped by Ashkenazy, the Mortgage Borrower, and/or the Mezz Borrower in at least two ways: through intentional material misrepresentations; and by engaging in acts of willful misconduct and/or gross negligence.

ANSWER: Paragraph 75 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 75.

76.     Since Lender enforced its rights under the Mortgage and Mezz Loan Documents and Amtrak filed its eminent-domain proceeding, Ashkenazy has repeatedly triggered multiple Recourse Liabilities.  Each of these events requires Borrower and Ashkenazy to pay any actual loss or damage Lender incurs as a result of the misconduct.

ANSWER: Paragraph 76 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 76.

77.     Under both the Mortgage and Mezz Guaranties, Ashkenazy is personally liable for the damages sustained.

ANSWER: Paragraph 77 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 77.

78.     The Loan Documents list the various Recourse Liabilities, which include the Misrepresentation and Misconduct Provisions.

ANSWER:  Ashkenazy denies the allegations in Paragraph 78 and refers to the documents

referenced therein for their contents.

79.     Pursuant to the Misrepresentation Provision, none of Mortgage Borrower, Mezz
Borrower, Guarantor, or any of their affiliates can make an "intentional material
misrepresentation in writing . . . in connection with the Loan." (Mortgage Loan Agreement at §
11.22(i); Mezz Loan Agreement at § 11.22(i)).

ANSWER:  Ashkenazy denies the allegations in Paragraph 79 and refers to the documents

referenced therein for their contents.

80.     Ashkenazy and/or Borrower triggered the Misrepresentation Provision by the

following actions:

(a)     On or around May 19, 2022, Ashkenazy directed ArentFox and Kasowitz,
purportedly representing USSM and USI, to file a written answer to Amtrak's complaint for
condemnation.  At that time, Lender had already exercised its rights under the Mezz Loan
Documents to replace Ashkenazy as manager of USI, so Ashkenazy did not have authority to
direct a filing on USI's behalf.  The filing of the answer – and the misrepresentations made
therein regarding the legal representation of USI – were an intentional material misrepresentation
because Ashkenazy knew he did not have authority over USI.

(i)     The misrepresentations of Ashkenazy's continued control over USI
triggered liability under both the Mortgage and Mezz Guaranties. Ashkenazy represented that he
had sole authority to make decisions for USI when Ashkenazy knew he lacked authority because
he no longer acted as USI's manager and USI never consulted with Lender before filing the
answer as required under the Mortgage Loan Agreement. The answer likewise intentionally
misrepresented the effect of Lender's exercise of rights under the Mezz Loan and Pledge
Agreements because Lender had replaced the manager of USI at the time Ashkenazy
misrepresented his authority. USSM also did not consult with Lender before filing the answer as
required. The misrepresentation of Ashkenazy's continued control over USI additionally
contradicted Lender's right to act as attorney-in-fact during an event of default for Mortgage
Borrower under the Mortgage Loan Agreement and Mezz Borrower under the Mezz Loan
Agreement. By flouting his loss of power, Ashkenazy misrepresented or caused the
misrepresentation of the status of his rights and powers under the Loan Documents.

(b)     On or around May 20, 2022, Ashkenazy directed his counsel to write to the duly
appointed counsel for USI that had been retained by Henrich, alleging that the answer filed at
Henrich's direction was "invalid." Kasowitz improperly demanded counsel to withdraw their
appearance, continuing to misrepresent that Kasowitz and ArentFox represented USI's interests
in the eminent-domain proceeding.

(i)     This misrepresentation triggered liability under both the Mortgage and
Mezz Guaranties. Ashkenazy represented that he was authorized to act on behalf of Mortgage
Borrower in the eminent-domain proceeding when he had lost all such authority. The

misrepresentation likewise misrepresented the effect of Lender's exercise of rights under the Mezz Loan and Pledge Agreements regarding the replacement of USI's manager. Neither USI nor USSM consulted with Lender as required under the Mortgage and Mezz Loan Agreements, and the misrepresentation of Ashkenazy's authority over USI directly contradicted Lender's attorney-in-fact rights over Mortgage and Mezz Borrowers provided under the respective Loan Documents.

(c)     On or around May 20, 2022, Joe Press, Chief Operating Officer of AAC, wrote an email to USI's landlord, Union Station Redevelopment Corporation ("USRC"). In the email, Press wrote that "any effort to commandeer control is invalid," that Ashkenazy continued as manager, and that Lender was "not authorized to act on USI's behalf." AAC is a highly sophisticated, well-counseled real estate firm with extensive experience with commercial mortgage and mezzanine loans.  Given his work with the station and familiarity with the parties' agreements, Press knew or should have known these written statements were material misrepresentations.

(i)     Press's misrepresentations to USRC triggered liability under both the Mortgage and Mezz Guaranties.  Under the Loan Documents, Press acted as an Affiliate of the respective Borrower. Press's written statements misrepresented who was authorized to act on behalf of Mortgage Borrower.  The misrepresentations likewise intentionally misrepresented Lender's exercise of rights under the Mezz Loan and Pledge Agreements regarding the replacement of Ashkenazy as manager.

(d)     The written statement sent by ArentFox and Kasowitz on May 20, 2022, to inform Amtrak that both USSM and USI consented to maintaining the status quo of property management—the same trigger for Springing Recourse—also materially misrepresented that Ashkenazy could speak on USI's behalf.

(i)     Triggering both the Mortgage and Mezz Guaranties, Ashkenazy intentionally misrepresented that he had the sole authority to speak on behalf of Mortgage Borrower when Ashkenazy knew he did not. These misrepresentations likewise intentionally misrepresented Lender's exercise of rights under the Mezz Loan and Pledge Agreements regarding the replacement of Ashkenazy as manager. Neither USI nor USSM consulted with Lender as required under the Mortgage and Mezz Loan Agreements, and the misrepresentation of Ashkenazy's authority over USI directly contradicted Lender's attorney-in-fact rights over Mortgage and Mezz Borrowers provided under the respective Loan Documents.

(e)     On June 3, 2022, ArentFox and Kasowitz filed a motion to strike the answer properly filed on USI's behalf at the direction of Henrich. The motion to strike directly challenges Henrich's authority and Lender's exercise of rights under the Loan Documents, containing numerous misrepresentations, such as:

(i)     "[B]oth the Mortgage Lender and Kookmin unreasonably withheld consent to the Investment under the Loan Documents and refused to allow the transaction to proceed" when Ashkenazy knew that Kookmin had no ownership interest in the Mortgage Loan at the time of the purported Investment and could not have withheld consent;

(1)     This misrepresentation triggered liability under the Mortgage Guaranty for intentionally misstating Mortgage Lender's consent authority when Mortgage Borrower sought an outside investment to bring the Mortgage Loan back into good standing;

(ii)     "Lender has interfered with Owners' ability to lease space in Union Station to prospective tenants by instructing brokers and others not to negotiate or speak with Owners" and "met with existing Union Station tenants . . . about leasing space inside Union Station" when Ashkenazy knew that Lender had the right to consent to all leases given Borrower's default;

(1)     This misrepresentation triggered both the Mortgage and Mezz Guaranties given Lender's rights during a continuing event of default. In both the Mortgage and Mezz Loan Agreements, Lender has explicit consent rights with respect to any Major Lease, which is defined to include any lease entered into after the occurrence of an event of default. (Mortgage Loan Agreement at § 4.1.9(c); Mezz Loan Agreement at § 4.1.9(c));

(iii)     "Lender wrongfully asserted complete control over Union Station and its management" when Ashkenazy knew that Lender properly exercised its rights under both of the Loan Documents;

(1)     This misrepresentation triggered both the Mortgage and Mezz Guaranties as the Loan Documents provide Lender extensive rights during an event of default. (Mortgage Loan Agreement at § 7.2(c); Mezz Loan Agreement at § 7.2(c));

(iv)     Lender did not have the authority to appoint Henrich as manager, and Henrich, therefore, did not have the authority to retain counsel for USI when Lender and Henrich acted properly under the Loan Documents. Ashkenazy argues that the replacement of USI's manager "had no effect" when Ashkenazy knew that Lender properly exercised its rights under the Mezz Loan and Pledge Agreements;

(1)     This misrepresentation triggered both the Mortgage and Mezz Guaranties because it intentionally misstates who was authorized to act on behalf of Mortgage Borrower and intentionally misrepresents Lender's exercise of rights under the Mezz Loan and Pledge Agreements regarding the replacement of Ashkenazy as manager;

(v)     The filing of the motion to strike, as a whole, misrepresented Ashkenazy's authority over USI;

(1)     This Misrepresentation triggered liability under both the Mortgage and Mezz Guaranties because neither USI nor USSM consulted with Lender as required before filing the motion to strike.  Additionally, the misrepresentation of Ashkenazy's authority over USI directly contradicted Lender's right to act as attorney-in-fact over the Mortgage and Mezz Borrowers under the respective Loan Documents.

(f)     With Ashkenazy's motion to strike, Press submitted a declaration as the Chief Operating Officer of AAC. Press made material misrepresentations used as support in the motion to strike, including:

(i)      The allegation that Lender "unreasonably withheld consent" on the Investment;

(ii)      The allegation that "Lender began to interfere with Owners' operation of the Station"; and

(iii)      The allegation that Lender interfered with prospective and existing tenants. 1. These misrepresentations triggered liability under both the Mortgage and Mezz Guaranties as previously described.

(g)      The foreclosure sale occurred on June 14, 2022, and Lender was the highest bidder, purchasing USSM's interest in USI by credit bid. After the foreclosure sale concluded, Ashkenazy has made numerous written misrepresentations alleging that the foreclosure sale was invalid and had no effect on the ownership of USI.

(i)      On June 23, 2022, Ashkenazy's counsel sent a letter to Lender's counsel, arguing that the "purported foreclosure merely shuffled papers among your client's entities" and that Ashkenazy "dispute[s] the validity" of the foreclosure on the Mezz Loan.

(1)      Ashkenazy and USSM triggered liability under the Mezz Guaranty because these misrepresentations are directly contradicted by the Mezz Loan and Pledge Agreements that provide Lender certain rights and remedies, including foreclosure, upon USSM's default.

(ii)      On June 24, 2022, Ashkenazy's counsel filed a reply in further support of its motion to strike, reiterating the same material misrepresentations from its other filings. In addition, Ashkenazy claimed that the foreclosure sale had "no effect given the pendency of this action" when nothing in the Loan Documents precluded Lender from foreclosing on the Mezz Loan after USSM's default.

(1)      Ashkenazy and USSM triggered liability under the Mezz Guaranty with these misrepresentations regarding Lender's exercise of rights under the Mezz Loan and Pledge Agreements.

(2)      The filing of the motion to strike likewise misrepresented Ashkenazy's authority over USI, triggering liability under both the Mortgage and Mezz Guaranties as previously described.

(iii)      On August 4, 2022, filed the Declaratory Judgment Action against USSM for Ashkenazy's continued intentional misrepresentation that the foreclosure sale was invalid. Lender sought a preliminary injunction to enjoin USSM, including Ashkenazy, from holding itself out as the owner of USI. USSM filed an opposition, challenging the validity of the foreclosure sale. In USSM's opposition papers, USSM misrepresented that:

(1)      "Lenders unreasonably withheld consent to the Investment under the Loan Documents and refused to allow the transaction to proceed"; and

(2)     "Lender has unlawfully interfered with the day-to-day operation of Union Station" by working with prospective and existing tenants on new or renewal leases.

a.     These misrepresentations triggered liability under the Mortgage and Mezz Guaranties as previously described.

(iv)     With its opposition papers, Press submitted a declaration in opposition to Lender's requested relief, making many of the same arguments raised in the motion to strike. In the declaration, Press misrepresented that:

(1)     Lender had the authority to consent to an outside investment but "unreasonably withheld consent";

(2)     Lender "began to interfere with the operations of the Station"; and

(3)     Lender interfered with prospective and existing tenants.

a.     These misrepresentations triggered liability under the Mortgage and Mezz Guaranties as previously described.

(v)     On September 19, 2022, USSM filed its answer in the Declaratory Judgment Action. In the affirmative defenses of its answer, USSM misrepresented that:

(1)     The foreclosure sale was invalid and did not extinguish USSM's right, title, and interest in and to USI;

(2)     Lender "interfered with USSM's efforts to refinance the Loans to enable it to remedy the alleged default"; and

(3)     Lender "wrongly interfered with USSM's (and its affiliates') management of Union Station and existing and prospective contractual relationships."

a.     These intentional misrepresentations triggered liability under the Mezz Guaranty as misstating Lender's proper exercise of rights and remedies under the Mezz Loan and Pledge Agreements.

(h)     Upon information and belief, Ashkenazy was informing Amtrak, URSC, and other government agencies that Lender did not have the authority to settle the eminent-domain proceeding. In the eminent-domain proceeding, this was further apparent when Ashkenazy would not affirm Section 5.2.2, which explicitly provides Lender that right. The Court in that case directed the parties to meet and confer in an effort to consensually resolve the pending motion to strike. In response, the parties exchanged draft stipulations, and Lender included language that Section 5.2.2 of the Mortgage and Mezz Loans gave Lender the power to act as attorney-in-fact for both Mortgage Borrower and Mezz Borrower. On July 28, 2022, Ashkenazy's counsel struck the language and refused to recognize Lender's explicit rights under both of the Mortgage and Mezz Loan Agreements, signaling to all parties, including Amtrak, that Ashkenazy would interfere and frustrate Lender's exercise of rights.

(i)      This misrepresentation of Lender's role as attorney-in-fact triggered both the Mortgage and Mezz Guaranties.

(i)      On July 1, 2022, Ashkenazy's counsel sent a letter to Lender's counsel, demanding that Lender fund the property's operating expenses as it had done pre-foreclosure and stating that Lender "had no right to use its control of the lockbox unlawfully to attempt to seize control of the operations of Union Station." Contrary to these misstatements, Lender has exercised its rightful control over the property management given its ownership of USI post-foreclosure. Lender continues to pay the operating expenses at Union Station contrary to Ashkenazy's representations otherwise.

(i)      This intentional misrepresentation triggered liability under the Mezz Guaranty for misstating Lender's rights pursuant to the Mezz Loan and Pledge Agreements during a continuing event of default.

ANSWER:  Paragraph 80 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 80 and refers to the documents referenced therein for their contents.

81.      Ashkenazy's written misrepresentations triggered the Recourse Liabilities under both the Mortgage and Mezz Guaranties.  Ashkenazy has no interest in Union Station since Lender properly removed him as USI's manager and foreclosed on USSM's equity interests, but Ashkenazy continues to demand that JLL follow its directives.

ANSWER: Paragraph 81 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 81.

82.      In response of Ashkenazy's continued interference and obstruction, on August 4, 2022, Lender filed the Declaratory Judgment Action.  In addition to legal fees associated with defending and enforcing Lender's rights over the Mortgage and Mezz Loan Agreements, Lender was prevented from taking over the management and control of Union Station, causing lost opportunities with prospective tenants and cash flow issues.

ANSWER: Paragraph 82 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy admits that the DJ Action

was filed on August 4, 2022 and denies the remaining allegations in Paragraph 82.

83.      In addition to triggering the Misrepresentation Provision, Ashkenazy's misrepresentations and directives challenging Lender's exercise of rights under both the Mortgage and Mezz Loan Agreements implicated the Misconduct Provision.

ANSWER: Paragraph 83 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 83.

84.     Under the Misconduct Provision, none of Mortgage Borrower, Mezz Borrower, Guarantor, or any of their affiliates can direct or act with "gross negligence or willful misconduct . . . in connection with the Loan." (Mortgage Loan Agreement at § 11.22(ii); Mezz Loan Agreement at § 11.22(ii)).

ANSWER:  Ashkenazy denies the allegations in Paragraph 84 and refers to the documents referenced therein for their contents.

85.     Ashkenazy and/or Borrower triggered the Misconduct Provision by engaging in the following acts of willful misconduct and/or gross negligence:

(a)     Upon information and belief, Ashkenazy directed his agent and contract party, JLL, to not contract with Henrich or Lender to enter into a new property-management agreement. Lender properly exercised its right to replace the manager of USI pursuant to the Mezz Loan and Pledge Agreements.

(i)     Ashkenazy's direction to JLL ignored Lender's authority without basis and with full knowledge of the rights agreed to in the Mezz Loan and Pledge Agreements. These actions constitute willful misconduct or, at the very least, gross negligence in connection with the Mezz Loan, triggering the Mezz Guaranty.  At the time of Ashkenazy's direction, Ashkenazy did not have the authority to direct JLL regarding the management of Union Station. Neither Ashkenazy nor AAC had an interest in Union Station, making the Master Management Agreement with JLL ineffective as it related to Union Station.

(b)     Upon information and belief, Ashkenazy blocked the amendment of the existing property-management agreement to bring JLL into a direct contractual relationship with USI or Lender.

(i)     For the same reasons as stated above, Ashkenazy's misconduct to block the amendment of the property-management agreement interfered with Lender's exercise of rights under the Mezz Loan and Pledge Agreements, triggering the Mezz Guaranty. Ashkenazy's direction, moreover, prevented USI as Mortgage Borrower from entering into a direct relationship with the existing property-management company, triggering the Mortgage Guaranty. This obstruction amounts to willful misconduct or, at the very least, gross negligence because Ashkenazy knew he lacked authority to interfere.

(c)     Upon information and belief, Ashkenazy directed his agent and contract party, JLL, to withhold financial documentation from Lender that Lender needs to fund the operations at Union Station. Specifically, JLL notified Lender that despite Ashkenazy's representations to the court, bills are not being paid at Union Station and services are in jeopardy of being

interrupted. When Lender asked for documentation and copies of the relevant bills, JLL informed Lender that it was not allowed to provide documents to Lender at the direction of Ashkenazy.

       (i)    Withholding critical financial information amounts to willful misconduct or, at the very least, gross negligence because Lender has expansive rights of control under both the Mortgage and Mezz Loan Agreements during a continuing event of default. Ashkenazy knew that both USI and USSM were in default of their respective loans, and his misconduct aimed at interfering with Lender's rightful access to financial information triggered liability under both the Mortgage and Mezz Guaranties.

       (d)    Upon information and belief, Ashkenazy directed third parties, including tenants and vendors, to report to Ashkenazy as the manager for USI, and not Henrich or Lender.

       (i)    Lender properly exercised its rights under the Mezz Loan and Pledge Agreements, and Ashkenazy knew and agreed to Lender's rights when signing the agreements. Ashkenazy's direction to third parties to continue reporting to Ashkenazy as manager of USI after he was replaced constitutes willful misconduct or, at the very least, gross negligence. This misconduct triggered the Mezz Guaranty by interfering with Lender's exercise of rights under the Mezz Loan, but also the Mortgage Guaranty by interfering with Lender's consent rights during an event of default under the Mortgage Loan.

       (e)    Upon information and belief, Ashkenazy provided JLL conflicting information, direction, and instructions regarding who controls the property management at Union Station.

       (i)    Ashkenazy was aware that Lender had control rights over the property management at Union Station pursuant to the rights and remedies exercised under the Mezz Loan and Pledge Agreements and pursuant to the rights in the Loan Documents during an event of default. Ashkenazy's directions otherwise constitute willful misconduct or, at the very least, gross negligence. These actions trigger the Mortgage and Mezz Guaranties for the reasons previously stated.

       (f)    Upon information and belief, Ashkenazy directed his agents, including JLL, to withhold financial information, property information, and other books and records from Henrich and Lender.

       (i)    Directing agents to withhold critical financial information from Lender when Lender had expansive rights under the Mortgage and Mezz Loan Agreements constitutes willful misconduct and/or gross negligence for the reasons previously stated, triggering both the Mortgage and Mezz Guaranties.

       (g)    On September 29, 2022, Lender's counsel wrote to USSM's counsel in the Declaratory Judgment Action to request that USSM consent to judgment regarding the rightful ownership and control in USI. USSM refused to respond. Upon information and belief, Ashkenazy directed USSM's counsel to not respond to Lender's request, requiring Lender to continue litigating the Declaratory Judgment Action.

(i)      USSM's position in the Declaratory Judgment Action contradicts positions taken by Ashkenazy in this action, specifically with regards to Ashkenazy's motion to dismiss Lender's original complaint. In Ashkenazy's motion to dismiss, Ashkenazy claimed that the Mezz Loan was paid in full pursuant to the foreclosure action that USSM (the entity Ashkenazy controls) continues to challenge in the Declaratory Judgment Action. These contrary positions constitute willful misconduct, triggering the Misconduct Provision of the Mezz Guaranty.

(h)      The lies and misrepresentations made by Ashkenazy, Mortgage Borrower (under Ashkenazy's direction), Mezzanine Borrower, and/or any of their affiliates as previously described, *see supra* ¶¶ 80(a)-(i), also constitute willful misconduct or, at the very least, gross negligence. For months, Ashkenazy ignored the explicit language in the Loan Documents that provided Lender with various rights and remedies during a continuing event of default. Ashkenazy and his affiliates repeatedly tried to avoid the consequences for failing to meet the respective Borrowers' obligations under the Mortgage and Mezz Loan Agreements. By directing counsel to file documents purportedly on behalf of USI, to misrepresent the control and authority over USI, to challenge the representation retained by Henrich (as the duly appointed manager of USI), and to ignore the validity of the foreclosure sale in correspondence and filings, Ashkenazy and/or his affiliates purposely delayed the inevitable. At all times during Lender's exercise of rights under the Mortgage and Mezz Loan Agreements, Ashkenazy knew that he no longer had authority to act on behalf of USI. Neither Ashkenazy nor his affiliates challenged the foreclosure sale before it occurred, instead relying on meritless arguments post-sale that Lender merely "prepared papers" to foreclose. Directing counsel and third parties contrary to these facts constitutes willful misconduct or, at the very least, gross negligence. As described above:

(i)      The filed answer purportedly on behalf of USI triggered liability under both the Mortgage and Mezz Guaranties;

(ii)      The letter by counsel demanding Henrich withdraw the answer authorized by USI triggered liability under both the Mortgage and Mezz Guaranties;

(iii)      Press's email to USRC triggered liability under both the Mortgage and Mezz Guaranties;

(iv)      The consent to having JLL resume property management after Lender properly terminated the agreement triggered both the Mortgage and Mezz Guaranties;

(v)      The motion to strike and Press's declaration submitted therewith triggered both the Mortgage and Mezz Guaranties;

(vi)      Ashkenazy's misrepresentations to Amtrak, USRC, and other government agencies regarding Lender's lack of authority to settle the eminent-domain proceeding triggered both the Mortgage and Mezz Guaranties, along with the draft stipulations exchanged to resolve the pending motion to strike in which Ashkenazy's counsel struck language recognizing Lender's explicit rights under Section 5.2.2 of the Mortgage and Mezz Loan Agreements;

(vii)      The written misrepresentations challenging the validity of the foreclosure sale triggered liability under the Mezz Guaranty;

27

(viii)   The opposition and declaration submitted therewith in the Declaratory Judgment Action challenging the validity of the foreclosure sale triggered liability under the Mortgage and Mezz Guaranties; and

(ix)   The answer filed in the Declaratory Judgment Action triggered the Mezz Guaranty.

(i)   Ashkenazy and his affiliates have improperly asserted rights of direct or indirect ownership of USI notwithstanding the continuing state of default under the Mezz Loan and Lender proper's exercise of its rights under the Mezz Loan and Pledge Agreements. Ashkenazy's willful misconduct interfered with and frustrated Lender's ability to operate and manage USI once Lender exercised its rights.

(i)   Ashkenazy's willful misconduct triggered liability under the Mezz Guaranty.

ANSWER:  Paragraph 85 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 85 and refers to the documents referenced therein for their contents.

86.   The actions described above constitute willful misconduct because Ashkenazy and his affiliates intentionally ignored the language of the Loan Documents when defying or directing others to defy Lender's rightful exercise of rights and remedies under both the Mortgage and Mezz Loan Agreements. If not willful misconduct, the actions, at the very least, smack of intentional wrongdoing to constitute gross negligence.

ANSWER: Paragraph 86 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 86.

87.   These actions triggered the Mortgage and Mezz Guaranties, making Ashkenazy liable for costs and damages sustained by Lender. Withholding critical financial information caused various late fees and shutoff notices that could have been avoided with proper disclosure. Lender sustained, and continues to accrue, legal fees associated with defending and enforcing Lender's rights over the Mortgage and Mezz Loan Agreements. Ashkenazy's misconduct put the ground lease of Union Station at risk, threatening Lender with damages in the hundreds of millions of dollars. Additionally, Ashkenazy's willful misconduct and/or gross negligence prevented Lender from taking over the management and control of Union Station for months, causing lost opportunities with prospective tenants and cash flow issues.

ANSWER: Paragraph 87 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 87.

88.     These filings, written statements, and oral directives by Ashkenazy or his affiliates violated multiple Recourse Liabilities events, triggering Borrower's obligation to pay actual costs and damages accrued from the violations, including all associated legal fees and costs.

ANSWER: Paragraph 88 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 88.

## AS AND FOR THE FIRST CAUSE OF ACTION
### *(Breach of Contract – Springing Recourse – Mortgage Guaranty)*

89.     Lender repeats and realleges paragraphs 1 through 88 as if fully restated herein

ANSWER: Ashkenazy incorporates by reference his responses to the allegations in Paragraphs 1 through 88 as if fully set forth herein.

90.     The Mortgage Guaranty is a valid and enforceable contract made between Ashkenazy and Lender.

ANSWER:  Paragraph 90 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 90.

91.     Lender has performed all of its obligations under the Mortgage Guaranty and underlying Loan Documents.

ANSWER: Paragraph 91 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 91.

92.     Ashkenazy's interference with Lender's proper exercise of its rights under the Loan Documents to terminate JLL as property manager of Union Station or contract with JLL directly triggered a Springing Recourse Event under the Custodian Provision.

ANSWER: Paragraph 92 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 92.

93.     Under the Custodian Provision of the Mortgage Loan Agreement, "any Affiliate,
officer, director, or representative which Controls Borrower" cannot "consent[] to or acquiesce[]
in or join[] in an application for the appointment of a custodian . . . other than in connection with
a request or action commenced by Lender or its affiliate." (Mortgage Loan Agreement at §
11.22).

ANSWER:  Ashkenazy denies the allegations in Paragraph 93 and refers to the documents

referenced therein for their contents.

94.     Although Lender had replaced Ashkenazy as manager of USI pursuant to
Lender's rights under the Mezz Loan Agreement, Ashkenazy retained counsel purportedly on
behalf of USI, as well as USSM.

ANSWER: Paragraph 94 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 94.

95.     Ashkenazy directed counsel to make certain representations and filings
purportedly on behalf of USI.

ANSWER: Ashkenazy denies the allegations in Paragraph 95.

96.     Ashkenazy triggered this Springing Recourse Event by: (a) Directing
Ashkenazy's counsel to inform Amtrak that both USI (Mortgage Borrower) and USSM (Mezz
Borrower) would "consent to preserve the status quo of Union Station management," thereby
acquiescing to an alternate property manager that Lender had not requested; (b) submitting the
June 26 Letter on behalf of USI, challenging Lender's request with the court to contract directly
with JLL or seek another property manager; and (c) Filing the Limited Opposition on behalf of
USSM and purportedly on behalf of USI to further entrench Ashkenazy against Lender in the
appointment of property management of Union Station.

ANSWER: Paragraph 96 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 96.

97.     Ashkenazy's counsel claimed to represent both the Mortgage Borrower (USI) and the Mezz Borrower (USSM) when consenting to Amtrak's request, submitting the June 26 Letter, and filing the Limited Opposition.

ANSWER: Ashkenazy denies the allegations in Paragraph 97 and refers to the documents referenced therein for their content.

98.     These actions taken on behalf of the Mortgage Borrower triggered the Springing Recourse Event in the Mortgage Loan.

ANSWER: Paragraph 98 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 98.

99.     By the Springing Recourse Event, Borrower and Ashkenazy become fully liable for the debt owed on the Mortgage Loan.

ANSWER: Paragraph 99 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 99.

100.     Under the Mortgage Guaranty, Ashkenazy is personally liable as a primary obligor.

ANSWER: Paragraph 100 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 100.

101.     Ashkenazy has thus far refused to pay its obligations, thereby breaching the obligations contained in the Mortgage Guaranty.

ANSWER: Paragraph 101 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 101.

102.     Accordingly, Ashkenazy is personally liable for the full debt owed on the Mortgage Loan, amounting to over $420 million.

ANSWER: Paragraph 102 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 102.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Breach of Contract – Springing Recourse – Mezz Guaranty)

103.    Lender repeats and realleges paragraphs 1 through 102 as if fully restated herein.

ANSWER: Ashkenazy incorporates by reference his responses to the allegations in Paragraphs 1 through 102 as if fully set forth herein.

104.    The Mezz Guaranty is a valid and enforceable contract made between Ashkenazy and Lender.

ANSWER:  Paragraph 104 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 104.

105.    Lender has performed all of its obligations under the Mezz Guaranty and underlying Loan Documents.

ANSWER: Paragraph 105 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 105.

106.    Ashkenazy's interference with Lender's proper exercise of its rights under the Loan Documents to terminate JLL as property manager of Union Station or contract with JLL directly triggered a Springing Recourse Event under the Custodian Provision.

ANSWER: Paragraph 106 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 106.

107.    Under the Custodian Provision of the Mezz Loan Agreement, "any Affiliate, officer, director, or representative which Controls Borrower or Mortgage Borrower" cannot "consent[] to or acquiesce[] in or join[] in an application for the appointment of a custodian . . . other than in connection with a request or action commenced by Lender or its affiliate." (Mezz Loan Agreement at § 11.22).

ANSWER: Ashkenazy denies the allegations in Paragraph 107 and refers to the documents referenced therein for their contents.

108.    Although Lender had replaced Ashkenazy as manager of USI pursuant to Lender's rights under the Mezz Loan Agreement, Ashkenazy retained counsel purportedly on behalf of USI, as well as USSM.

ANSWER: Paragraph 108 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 108.

109.    Ashkenazy directed counsel to make certain representations and filings purportedly on behalf of USI and USSM.

ANSWER:  Ashkenazy denies the allegations in Paragraph 109.

110.    Ashkenazy triggered this Springing Recourse Event by: (a) Directing Ashkenazy's counsel to inform Amtrak that both USI (Mortgage Borrower) and USSM (Mezz Borrower) would "consent to preserve the status of Union Station management," thereby acquiescing to an alternate property manager that Lender had not requested; (b) Submitting the June 26 Letter on behalf of USSM and purportedly on behalf of USI, challenging Lender's request with the court to contract directly with JLL or seek another property manager; and (c) filing the Limited Opposition on behalf of USSM and purportedly on behalf of USI to further entrench Ashkenazy against Lender in the appointment of property management of Union Station.

ANSWER: Paragraph 110 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 110.

111.    Ashkenazy's counsel claimed to represent both the Mortgage Borrower (USI) and the Mezz Borrower (USSM) when consenting to Amtrak's request, submitting the June 26 Letter, and filing the Limited Opposition.

ANSWER:  Ashkenazy denies the allegations in Paragraph 111 and refers to the documents referenced therein for their content.

112.    These actions taken on behalf of the Mezz Borrower and Mortgage Borrower triggered the Springing Recourse Event in the Mezz Loan.

ANSWER: Paragraph 112 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 112.

113.    By the Springing Recourse Event, Borrower and Ashkenazy become fully liable for the debt owed on the Mezz Loan.

ANSWER: Paragraph 113 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 113.

114.    Under the Mezz Guaranty, Ashkenazy is personally liable as a primary obligor.

ANSWER: Paragraph 114 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 114.

115.    Ashkenazy has thus far refused to pay its obligations, thereby breaching the obligations contained in the Mezz Guaranty.

ANSWER: Paragraph 115 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 115.

116.    Accordingly, Ashkenazy is personally liable for the full debt owed on the Mezz Loan, amounting to over $140 million.

ANSWER: Paragraph 116 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 116.

## AS AND FOR THE THIRD CAUSE OF ACTION
### *(Breach of Contract – Recourse Liabilities – Mortgage Guaranty)*

117.    Lender repeats and realleges paragraphs 1 through 116 as if fully restated herein.

ANSWER: Ashkenazy incorporates by reference his responses to the allegations in Paragraphs 1 through 116 as if fully set forth herein.

118.    The Mortgage Guaranty is a valid and enforceable contract made between Ashkenazy and Lender.

ANSWER:  Paragraph 118 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 118.

119.    Lender has performed all of its obligations under the Mortgage Guaranty and underlying Loan Documents.

ANSWER: Paragraph 119 contains legal argument and conclusions to which no response is required.  To the extent any further response is required, Ashkenazy denies the allegations in Paragraph 119.

120.    Under the Misrepresentation Provision, none of Mortgage Borrower, Guarantor, or any of their affiliates can make an "intentional material misrepresentation in writing . . . in connection with the Loan." (Mortgage Loan Agreement at § 11.22(i)).

ANSWER:  Ashkenazy denies the allegations in Paragraph 120 and refers to the documents referenced therein for their content.

121.    As detailed above, Ashkenazy triggered the Misrepresentation Provision in the Mortgage Loan Agreement by: (a) the answer filed by ArentFox and Kasowitz purportedly on behalf of USI in the eminent domain proceeding; (b) the letter written by ArentFox and Kasowitz to the counsel properly retained by Henrick on behalf of USI demanding that they withdraw their appearance (c) The email written by Press to USRC, alleging that Ashkenazy was still the manager of USI (d) The written statement consenting to Amtrak's request to maintain the status quo in property management purportedly on behalf of USI; (e) The motion to strike containing misrepresentations regarding Mortgage Lender's consent authority in the proposed investment, Lender's alleged interference with prospective and existing tenants, Lender's rights under an event of default, and who had authority to act on behalf of Mortgage Borrower; (f) Press's declaration submitted with the motion to strike providing support for the motion to strike's misrepresentations; (g) the reply filed in further support of the motion to strike, reiterating the misrepresentations made in the motion and misrepresenting Ashkenazy's authority over USI; (h) USSM's opposition to Lender's requested preliminary injunction in the Declaratory Judgment Action that contained misrepresentations regarding Lender's consent authority in the proposed investment with Mortgage Borrower and Lender's alleged interference with prospective and existing tenants; (i) Press's declaration submitted with USSM's opposition in the Declaratory

Judgment Action providing support for the opposition's misrepresentations; (j) The draft stipulations exchanged to resolve the pending motion to strike in which Ashkenazy's counsel struck language regarding Lender's attorney-in-fact rights under Section 5.2.2 of the Mortgage Loan Agreement; and (k) The letter written to counsel alleging that Lender had no right to control the operating expenses at Union Station.

ANSWER: Paragraph 121 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 121.

122.    Under the Misconduct Provision, none of Mortgage Borrower, Guarantor, or any of their affiliates can direct or act with "gross negligence or willful misconduct . . . in connection with the Loan." (Mortgage Loan Agreement at § 11.22(ii)).

ANSWER:  Ashkenazy denies the allegations in Paragraph 122 and refers to the documents

referenced therein for their contents.

123.    As detailed above, Ashkenazy triggered the Misconduct Provision in the Mortgage Loan Agreement by engaging in the following acts of willful misconduct and/or gross negligence: (a) Blocking the amendment of the existing property-management agreement to bring JLL into a direct contractual relationship with USI or Lender; (b) Directing JLL to withhold financial information and other books and records from Lender that Lender needed to fund obligations at Union Station; (c) Directing third parties, including tenants and vendors, to report to Ashkenazy as manager of USI, no Henrich; (d) Providing conflicting information to JLL as to who controls the property management of Union Station; (e) Directing its agents to withhold property information and books and records from Henrich and Lender; (f) Striking language that recognized Lender's explicit attorney-in-fact rights under Section 5.2.2 of the Mortgage Loan Agreement; and (g) Lying about and misrepresenting Ashkenazy's control and authority over USI when Lender properly exercised its rights and remedies explicitly provided by the Mortgage Loan Agreement.

ANSWER: Paragraph 123 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 123.

124.    By triggering the Recourse Liabilities, Mortgage Borrower and Ashkenazy are liable for any actual loss, damages, or costs associated with the recourse event, including the costs and expenses related to associated attorneys' fees.

ANSWER: Paragraph 124 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 124.

125.    Lender has sustained damages, including over $1 million in attorneys' fees and costs to enforce Lender's exercise of rights under the Mortgage Loan Agreement, costs associated with late payments and shutoff notices, and opportunity costs associated with Ashkenazy's interference with Lender's rightful management and control over Union Station. Ashkenazy's misconduct has also put the ground lease at Union Station at risk. Lender has suffered damages, in an amount to be determined at trial, but no less than in the multiple of tens of millions of dollars.

ANSWER: Paragraph 125 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 125.

126.    Under the Mortgage Guaranty, Ashkenazy is personally liable as a primary obligor.

ANSWER: Paragraph 126 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 126.

127.    Ashkenazy has thus far refused to pay its obligations, thereby breaching the obligations contained in the Mortgage Guaranty.

ANSWER: Paragraph 127 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 127.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (*Breach of Contract – Recourse Liabilities – Mezz Guaranty*)

128.    Lender repeats and realleges paragraphs 1 through 127 as if fully restated herein.

ANSWER: Ashkenazy incorporates by reference his responses to the allegations in Paragraphs 1

through 127 as if fully set forth herein.

129.    The Mezz Guaranty is a valid and enforceable contract made between Ashkenazy and Lender.

ANSWER:  Paragraph 129 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 129.

130.    Lender has performed all of its obligations under the Mezz Guaranty and
underlying Loan Documents.

ANSWER: Paragraph 130 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 130.

131.    Under the Misrepresentation Provision, none of Mortgage Borrower, Mezz
Borrower, Guarantor, or any of their affiliates can make an "intentional material
misrepresentation in writing . . . in connection with the Loan." (Mezz Loan Agreement at §
11.22(i)).

ANSWER: Ashkenazy denies the allegations in Paragraph 131 and refers to the documents

referenced therein for their content.

132.    As detailed above, Ashkenazy triggered the Misrepresentation Provision in the
Mezz Loan Agreement by: (a) The answer filed by ArentFox and Kasowitz on behalf of USSM
in the eminent-domain proceeding; (b) The letter written by ArentFox and Kasowitz to counsel
properly retained by Henrich on behalf of USI, demanding that they withdraw their appearance;
(c) The email written by Press to USRC, alleging that Lender's proper exercise of rights under
the Mezz Loan and Pledge Agreements was "invalid" and that Ashkenazy was still the manager;
(d) The written statement consenting to Amtrak's request to maintain the status quo in property
management, ignoring Lender's exercise of rights under the Mezz Loan and Pledge Agreements;
(e) The motion to strike containing misrepresentations regarding Lender's alleged interference
with prospective and existing tenants, Lender's rights under an event of default, and the
replacement of USI's manager; (f) Press's declaration submitted with the motion to strike
providing support for the motion to strike's misrepresentations; (g) The letter written to counsel
challenging the validity of the foreclosure on the Mezz Loan; (h) The reply filed in further
support of the motion to strike, reiterating the misrepresentations made in the motion and
challenging the validity and effect of the foreclosure sale; (i) USSM's opposition to Lender's
requested preliminary injunction in the Declaratory Judgment Action that contained
misrepresentations regarding Lender's consent authority in the proposed investment and
Lender's alleged interference with prospective and existing tenants; (j) Press's declaration
submitted with USSM's opposition in the Declaratory Judgment Action providing support for the
opposition's misrepresentations; (k) USSM's answer in the Declaratory Judgment Action,
containing misrepresentations regarding the validity of the foreclosure sale and Lender's alleged
interference; (l) The draft stipulations exchanged to resolve the pending motion to strike in
which Ashkenazy's counsel struck language regarding Lender's attorney-in-fact rights under

Section 5.2.2 of the Mezz Loan Agreement; and (m) the letter written to counsel alleging that Lender had no right to control the operating expenses at Union Station.

ANSWER: Paragraph 132 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 132.

133.    Under the Misconduct Provision, none of Mortgage Borrower, Mezz Borrower, Guarantor, or any of their affiliates can direct or act with "gross negligence or willful misconduct . . . in connection with the Loan." (Mezz Loan Agreement at § 11.22(ii)).

ANSWER:  Ashkenazy denies the allegations in Paragraph 133 and refers to the documents

referenced therein for their contents.

134.    As detailed above, Ashkenazy further triggered the Misconduct Provision in the Mezz Loan Agreement by engaging in the following acts of willful misconduct and/or gross negligence: (a) Directing its agent and contract party, JLL to not contract with USI, through Henrich, or Lender directly; (b) Blocking the amendment of the existing property management agreement to bring JLL into a direct contractual relationship with USI or Lender; (c) Directing JLL to withhold financial information and other books and records from Lender that Lender needed to fund obligations at Union Station; (d) Directing third parties, including tenants and vendors, to report to Ashkenazy as manager of USI, not Henrich; (e) Providing conflicting information to JLL as to who controls the property management of Union Station; (f) Directing its agents to withhold property information and books and records from Henrich and Lender; (g) Taking contradictory positions in this action and the Declaratory Judgment Action; (h) Striking language that recognized Lender's explicit attorney-in-fact rights under Section 5.2.2 of the Mezz Loan Agreement; (i) lying about and misrepresenting Ashkenazy's control and authority over USI and challenging the validity of the foreclosure sale when Lender properly exercised its rights and remedies explicitly provided by the Mezz Loan Agreement; and (j) Improperly asserting rights of direct or indirect ownership of USI to interfere with and frustrate Lender's ability to operate and manage USI once Lender exercised its rights under the Mezz Loan and Pledge Agreements.

ANSWER: Paragraph 134 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 134.

135.    By triggering the Recourse Liabilities, Mezz Borrower and Ashkenazy are liable for any actual loss, damages, or costs associated with the recourse event, including the costs and expenses related to associated attorneys' fees.

ANSWER: Paragraph 135 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 135.

136.    Lender has sustained damages, including over $1 million in attorneys' fees and
costs to enforce Lender's exercise of rights under the Mezz Loan and Pledge Agreements, costs
associated with late payments and shutoff notices, and opportunity costs associated with
Ashkenazy's interference with Lender's rightful management and control over Union Station.
Ashkenazy's misconduct has also put the ground lease at Union Station at risk. Lender has
suffered damages, in an amount to be determined at trial, but no less than in the multiple of tens
of millions of dollars.

ANSWER: Paragraph 136 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 136.

137.    Under the Mezz Guaranty, Ashkenazy is personally liable as a primary obligor.

ANSWER: Ashkenazy denies the allegations in Paragraph 137 and refers to the documents

referenced therein for their content.

138.    Ashkenazy has thus far refused to pay its obligations, thereby breaching the
obligations contained in the Mezz Guaranty.

ANSWER: Paragraph 138 contains legal argument and conclusions to which no response is

required.  To the extent any further response is required, Ashkenazy denies the allegations in

Paragraph 138.

## GENERAL DENIAL

Ashkenazy denies each and every allegation in the Amended Complaint not specifically

admitted above.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

## Second Affirmative Defense

Plaintiffs' claims are barred by their own breach of contract, unclean hands, bad faith, and other culpable conduct.

## Third Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the doctrines of consent, assumption of the risk, and ratification.

## Fourth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by  the doctrine of estoppel.

## Fifth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches, statute of limitations, and statute of repose.

## Sixth Affirmative Defense

Plaintiffs' claims are barred by the doctrines of impossibility, impracticality, and frustration of purpose.

## Seventh Affirmative Defense

To the extent the Court determines in the DJ Action that Kookmin's foreclosure of the mezzanine loan was effective, the mezzanine loan has been paid in full and Kookmin cannot seek additional damages under the mezzanine guaranty.

## Eighth Affirmative Defense

Because of the condemnation of the leasehold interest at Union Station, Kookmin did not incur any damages in connection with the mortgage loan.

**PRAYER FOR RELIEF**

Wherefore, having fully answered the Complaint, Ashkenazy requests that the same be dismissed with prejudice; that Plaintiffs take nothing thereby; that Ashkenazy be awarded his reasonable attorney fees and costs incurred in connection with this action as allowed by law; and that Ashkenazy be awarded such other and additional relief as may be deemed just, equitable, or proper.

Dated: New York, New York           Respectfully submitted,
       December 12, 2023

                                           **KASOWITZ BENSON TORRES LLP**

                                           By:   */s/ David E. Ross*
                                                  David E. Ross
                                                  David J. Mark
                                                  Daniel J. Koevary
                                                  Andrew W. Breland
                                                  1633 Broadway
                                                  New York, New York 10019
                                                    Telephone: (212) 506-1700
                                                    Facsimile:  (212) 506-1800

                                                    *Attorneys for Defendant Ben Ashkenazy*